MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2018 ME 26
Docket:      Pen-17-196
Argued:      December 14, 2017
Decided:     February 13, 2018

Panel:       SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

ERIC NOBLES

SAUFLEY, C.J.

[¶1] Eric Nobles appeals from a judgment of conviction of operating under the influence (OUI) (Class C), 29-A M.R.S. § 2411(1-A)(C)(4), (5)(D) (2017), operating after habitual offender revocation (Class C), 29-A M.R.S. § 2557-A(2)(D) (2017), and driving to endanger (Class E), 29-A M.R.S. § 2413(1) (2017), entered by the court (Penobscot County, *Lucy, J.*) after a jury trial. Nobles contends that (A) the court abused its discretion in denying his motion for a mistrial after an officer testified that Nobles was on probation at the time of his arrest; (B) the prosecutor committed misconduct by (1) commenting on Nobles's reluctance to speak with the police before and after he was arrested and (2) asking the jury to hold Nobles "accountable" during closing arguments; and (C) the court erred in declining to instruct the

2

jury on the competing harms justification as to the counts of operating under the influence and driving to endanger. We affirm the judgment.

## I. BACKGROUND

[¶2] Viewing the evidence admitted at trial in the light most favorable to the State, the jury could have found the following facts beyond a reasonable doubt. *State v. Guyette*, 2012 ME 9, ¶ 2, 36 A.3d 916. On July 6, 2016, Nobles was driving his vehicle on a private camp road with a friend in the passenger seat. At around 7:00 p.m., a witness, who had left her camp and was in a pickup truck with her husband and their two grandchildren, observed Nobles's vehicle traveling toward them erratically and at a high rate of speed on the narrow dirt road. His vehicle was fishtailing, and they were forced to veer off the road to avoid being hit. The witness's stepson, who drove away from the witness's camp soon after she left, also encountered Nobles's vehicle barreling down the road and kicking up dust, forcing the stepson to pull off the road to get out of the way.

[¶3] The witness and her husband delivered the grandchildren to their mother at the end of the road and then waited there for the vehicle they had seen to pass them again so they could take down the license plate number. After about forty minutes, the witness and her husband heard a vehicle approaching

at a high rate of speed and saw Nobles's vehicle traveling toward them from behind. When Nobles reached the end of the road, the witness's husband pointed at him and told him to slow down. The passenger in Nobles's vehicle made a vulgar gesture with his hands and tongue before Nobles's vehicle turned toward town and proceeded down the road.

[¶4] The witness and her husband followed Nobles's vehicle to take note of the license plate number and to call the police. Nobles's vehicle was traveling fast down the road ahead of them and suddenly came to a complete stop. They stopped their car behind his. After a couple of minutes, Nobles's vehicle made a quick U-turn around the pickup truck and drove in the opposite direction. While the witness was on the phone with the police, the witness's husband began to turn his pickup around to follow him. At this time, Nobles did two "three-sixties" in the road and took off "like a shot out of a gun" toward State Route 11, a public road leading to the center of town in Millinocket.

[¶5] At about 8:00 p.m., after having been notified about the erratically operated vehicle, a Millinocket police officer saw Nobles's vehicle turn off Route 11 into the parking lot of a convenience store. The officer pulled in after Nobles and was later joined by another officer. Both officers observed that Nobles, who was in the driver's seat, had bloodshot eyes and that there was an

odor of alcohol emanating from his vehicle and breath. He was uncooperative, belligerent, and unresponsive, except to say that he would exit his vehicle only if the officers brought him a drink of water. During this encounter with law enforcement officers, Nobles offered no explanation for his erratic driving.

[¶6] After placing Nobles under arrest, the officers took him to the police station. Once there, he refused to participate in the standard field sobriety tests, to take a breath test, or to sign the form detailing the consequences of his refusal. He still offered no explanation for his actions. When asked for his address, Nobles responded that he was homeless and also stated, "I'm not taking your test," before throwing down the tube to the breath testing machine.

[¶7] Nobles was initially charged with a single count of OUI in July 2016, with complaints alleging operating after habitual offender revocation and driving to endanger filed in August. He was charged with all three crimes by indictment in September 2016.

[¶8] The court held a jury trial on April 18 and 19, 2017. During opening statements, defense counsel informed the jury that Nobles would be testifying. Counsel stated, "Now, my client was not drinking and he will explain that. And you're going to hear him talk about how frightened and confused he was . . . .

And my client, who is a rather meek man, got very confused, very anxious. He wasn't informed about what was going on. He didn't cooperate."

[¶9] The witness, the witness's stepson, and the two officers testified for the State at trial. When the arresting officer testified, Nobles objected after the following exchange:

> Q.      . . . . Now, after you went through this process with [arresting and attempting to test] him, did you allow him to bail or what happened from there?
>
> A.      He ended up being on probation.
>
> Q.      Excuse me. Can you just answer my question? Did you allow him to get bail?

Nobles immediately moved for a mistrial. The court denied the motion but provided a curative instruction, before the State resumed examination of the witness: "I instruct the jury to disregard the witness's last answer to [the prosecutor]'s question."

[¶10] The prosecutor also asked both officers if Nobles ever mentioned that he was frightened by or was being harassed by the witness and her husband, or if he gave any explanation as to why he was driving on a public road. Both officers testified that he did not, and defense counsel did not raise any objection to this line of questioning.

[¶11] After the State presented its case, Nobles testified. He told the jury that he knew at the time of the incident that his license had been revoked. He denied having driven at a high rate of speed before the witness and her husband began following him. He explained that the reason he had driven erratically and onto a public road was because he thought the witness and her husband were chasing him, he had seen something black and shiny in the witness's husband's hand that he thought was a gun, he was scared and concerned for his safety, and he needed to get to a telephone to call the police because neither he nor his passenger had a cellphone with a charged battery. Nobles testified that, although he had driven on the public road specifically to find the police, he did not tell them he was frightened or appear pleased to see them at the convenience store because he suffered from anxiety, and he was confused and scared. He testified that he did not remember yelling at the officers.

[¶12] At the close of trial, Nobles requested a jury instruction on the competing harms justification for the charge of operating after license revocation and, eventually, the charge of OUI as well, arguing that he was driving only because he was trying to get away from the greater harm posed by the witness's allegedly threatening husband. The court ruled that the competing harms instruction would be given for the charge of operating after

license revocation because that is the only crime that requires operation *on a public way* as an element. The court declined to give a competing harms instruction regarding the OUI charge because Nobles had admitted to operating on the private way before encountering the witness's and her stepson's vehicles. Nobles did not seek a competing harms instruction regarding the charge of driving to endanger.[1]

[¶13] During his closing argument, the prosecutor made the following statement regarding Nobles's behavior when approached by police:

> If this defendant was so concerned about what was happening to him, and his cell phone was dead, and he needed to get to the store to call the police, what happens? They show up and, well, officer, just what I was waiting for. I need to tell you something. Nope. He shut right up. He didn't even—he didn't even want to tell the police where he lived.

Also during closing and rebuttal arguments, the prosecutor characterized the role of the jury in a way that Nobles now argues constituted prosecutorial misconduct. The prosecutor stated,

> [Y]ou are charged with a duty of holding people accountable for misdeeds in our communities, that it's not just a job that's confined to the government or to the police. It depends upon quite often the participation of citizens.

---

[1] Nonetheless, in ruling on Nobles's requested competing harms instructions, the court stated, "I'm not persuaded that it applies to either the driving to endanger or the OUI, both of which the evidence is clear that he was driving before he encountered the [other] vehicle and had the experiences that he testified to."

. . . .

. . . And what the defendant's giving you here today, or gave you yesterday, was an exaggerated set of facts that he has to have for you in a courtroom to avoid being held accountable.

Now, this process, folks, as I said, of holding people accountable, people have different roles to play. And we respect those roles. . . . You're not here to punish. You're to decide whether or not [Nobles] should be held accountable. If there is punishment, then it's up to this learned presiding justice. You're not punishing him.

But folks, think about this. You have a responsibility and it's different from everybody else's. You too are members of the community. And when [the witness] says that she called the police because she was concerned about the danger that [Nobles] posed, she took her responsibility seriously. She did what her part was. And now you folks have a responsibility. That's how this process works in this country. It is left to citizens on juries to make decisions about whether or not people should be held accountable. Police can't do that by themselves. Prosecutors can't do it, the government can't do it. It comes down to people in your situation, based upon the evidence, and that's what you should decide this case on. Based upon the evidence.

[¶14] Defense counsel did not object to the prosecutor's closing arguments. The jury found Nobles guilty of all three charges.

[¶15] For operating under the influence, the court sentenced Nobles to four and one-half years' imprisonment, with all but two and one-half years suspended, and it imposed a two-year term of probation, a fine of $2,500, and

an eight-year license suspension.[2]  For operating after habitual offender revocation, the court sentenced Nobles to two years' imprisonment concurrent with the OUI sentence and a fine of $1,000; and for the driving to endanger count, the court sentenced Nobles to 150 days' imprisonment, concurrent with the other counts, and imposed a fine of $575 and a 180-day license suspension. Nobles appealed from the judgment.  *See* 15 M.R.S. § 2115 (2017); M.R. App. P. 2 (Tower 2016).[3]

## II.  DISCUSSION

A.    Motion for Mistrial

[¶16]  Nobles first contends that the court abused its discretion in denying his motion for a mistrial after the officer testified that Nobles was on probation at the time of his arrest.  He argues that the testimony was prejudicial because it painted him as a dangerous criminal with prior convictions.

[¶17]  In recognition of the trial court's superior vantage point in ruling on a motion for a mistrial, we review the denial of such a motion for an abuse of discretion.  *See State v. Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121.  We will vacate

---

[2]  In the preceding ten years, Nobles had been convicted of three or more OUI offenses.

[3]  The notice of appeal was filed before September 1, 2017, the effective date of the restyled Maine Rules of Appellate Procedure.  *See* M.R. App. P. 1 (providing that the restyled rules apply for appeals in which the notice of appeal was filed before September 1, 2017).

a court's denial of a motion for a mistrial "only when there is prosecutorial bad faith or there are exceptionally prejudicial circumstances." *State v. Tarbox*, 2017 ME 71, ¶ 18, 158 A.3d 957.

[¶18] "Generally, when a witness testifies to inadmissible evidence, a defendant is only entitled to a curative jury instruction, not a mistrial." *State v. Winslow*, 2007 ME 124, ¶ 19, 930 A.2d 1080. If the court has opted to provide a curative instruction, we will not disturb its decision unless the court committed clear error by not finding that the jury's exposure to prejudicial inadmissible evidence would incurably taint the jury's verdict. *See Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121. We presume that the jury follows the court's delivered jury instructions, including any curative instructions. *Tarbox*, 2017 ME 71, ¶ 18, 158 A.3d 957.

[¶19] Here, there is no indication of prosecutorial bad faith. The prosecutor did not ask any questions that could be expected to result in a response from the officer about Nobles's probation status. *See Winslow*, 2007 ME 124, ¶ 20, 930 A.2d 1080. Lack of prosecutorial bad faith is also demonstrated by the prosecutor's immediate reaction, asking the officer to answer only the question that he had posed. *See id.* Nor were the circumstances exceptionally prejudicial, given that the statement was isolated and vague, and

that Nobles himself testified that his license had been revoked.[4] *See Tarbox*, 2017 ME 71, ¶ 19, 158 A.3d 957. The court did not err in finding that a curative jury instruction was a sufficient remedy and did not abuse its discretion in denying Nobles's motion for a mistrial.

B.      Prosecutorial Misconduct

[¶20]   Nobles next argues that, although he did not challenge the prosecutor's conduct during trial, the trial court committed obvious error in failing to take any action to remedy prosecutorial misconduct. Specifically, he argues that he was deprived of a fair trial because the prosecutor (1) unconstitutionally commented on Nobles's reluctance to speak with the police before and after he was arrested and (2) impermissibly argued that the jury should hold Nobles "accountable" during closing arguments.

[¶21]   Because Nobles did not object at trial about what he contends on appeal was prosecutorial misconduct, we review for obvious error. *See State v. Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032. To prevail on an argument that prosecutorial misconduct amounted to obvious error, a defendant must first demonstrate that (1) there was prosecutorial misconduct that went

---

[4] Although Nobles also stipulated that he had been convicted of three or more OUI offenses in the preceding ten years, that information was not presented to the jury, and the jury was not asked to reach findings about those prior convictions.

unaddressed by the court and (2) the error was plain. *See id.* ¶ 36. An error is plain if it "is so clear under existing law that the court and the prosecutor were required to address the matter even in the absence of a timely objection." *State v. Robinson*, 2016 ME 24, ¶ 26, 134 A.3d 828 (quotation marks omitted). If the defendant meets this burden, the defendant must next demonstrate (3) that the error was sufficiently prejudicial to have affected the outcome of the proceeding, thereby demonstrating a reasonable probability that the error affected his substantial rights. *See Dolloff*, 2012 ME 130, ¶ 37, 58 A.3d 1032. Finally, we will set aside a jury's verdict only if we further conclude that (4) the error seriously affects the fairness and integrity of judicial proceedings. *Id.* ¶ 35. "When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." *Id.* ¶ 38.

1. Pre- and Post-Arrest Silence

[¶22] Nobles contends that the prosecutor engaged in misconduct in his closing argument when he referenced Nobles's pre- and post-arrest silence with the police. He contends that, at the time of his arrest and just following his arrest, he had the absolute constitutional right to remain silent and that the

prosecutor's argument violated his constitutional protection against compelled self-incrimination.

[¶23] When a defendant does not testify at trial, the Fifth and Fourteenth Amendments of the United States Constitution[5] may be violated if state prosecutors comment on the accused's invoked silence, including pretrial silence. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *State v. Lovejoy*, 2014 ME 48, ¶ 22, 89 A.3d 1066 ("[I]ndividuals are endowed with the Fifth Amendment's protections against compelled self-incrimination both before and after arrest."); *State v. Diaz*, 681 A.2d 466, 467-69 (Me. 1996).

[¶24] Although we have never required the use of any specific words for a person to invoke constitutional protection for his or her silence, we do require that the record demonstrate the defendant's actual intention to exercise the constitutional right to remain silent. *See Lovejoy*, 2014 ME 48, ¶ 25, 89 A.3d 1066. Here, there is no such showing in the record. To the contrary, Nobles did not remain silent; he was cursing and was belligerent and offensive in making

---

[5] The Fifth Amendment to the United States Constitution provides, in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." Section 1 of the Fourteenth Amendment to the United States Constitution provides, in relevant part, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

14

statements to the officers about getting out of his vehicle and about taking the breath test.

[¶25]  Moreover, when a defendant elects to testify in his own defense, the use of prearrest silence to impeach a criminal defendant's credibility does not violate the Fifth Amendment.  *See Jenkins v. Anderson*, 447 U.S. 231, 238 (1980).  "[I]mpeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truthfinding function of the criminal trial."  *Id.* Impeachment of a testifying defendant by the use of prearrest silence does not violate the Fourteenth Amendment.  *See id.* at 240.

[¶26]  In this case, Nobles had not yet testified when the prosecutor asked the officers about Nobles's statements and actions.  Defense counsel had, however, announced during her opening statement that Nobles would be testifying, and she had summarized the version of the facts to which he would testify.  Nobles's later testimony was consistent with counsel's opening statement and included testimony that he was driving on Route 11 to find a telephone and contact the police for protection, which was inconsistent with the observations of the officers in their initial encounter with Nobles.  The prosecutor's closing arguments were made after Nobles's testimony.  Because Nobles did not invoke his right to remain silent, did not actually remain silent,

and subsequently chose to testify at trial, he has not established any error, let alone obvious error "so clear under existing law that the court and the prosecutor were required to address the matter even in the absence of a timely objection." *Robinson*, 2016 ME 24, ¶ 26, 134 A.3d 828 (quotation marks omitted).

2.    Arguments Referring to Nobles's Accountability

[¶27] Nobles contends that the prosecutor's repeated argument that the jury had a duty to determine his accountability amounted to prosecutorial misconduct because it improperly suggested to the jury that it had a civic duty to find him guilty, resulting in prejudicial error.

[¶28]    Here, the language preceding and following the prosecutor's challenged statements provides important context. *See Dolloff*, 2012 ME 130, ¶ 70, 58 A.3d 1032. The prosecutor did not argue that the jury had an obligation to hold Nobles accountable; he instead indicated that it was the jury's job to determine *whether* Nobles should be held accountable.  Additionally, the prosecutor predicated the jury's duty to make that decision on its consideration of the evidence, stating, "that's what you should decide this case on. Based upon the evidence."   Although some of the prosecutor's comments, viewed in isolation, may appear similar to the comments that led us to hold that there was

prosecutorial misconduct upon a *preserved* claim of error in *State v. Begin*, 2015 ME 86, ¶¶ 25-28, 120 A.3d 97, the comments here, read in context, do not demonstrate obvious error requiring that we vacate the judgment of conviction.

[¶29]  Moreover, any potential prejudice was fully remedied by the court's full and effective instructions, including instructions that the attorneys' arguments are not evidence and that the jury's role is to consider the evidence to determine whether the State has proved each crime beyond a reasonable doubt.  *See id.* ¶ 28.

C.    Competing Harms Justification

[¶30]  Nobles finally contends that the court erred in declining to instruct the jury on the justification of competing harms with respect to the charges of operating under the influence and driving to endanger.  He argues that the competing harms justification was generated by his testimony that he had to continue driving to reach safety to avoid any physical confrontation with the witness's husband.

[¶31]  When reviewing a court's determination that the evidence was insufficient to generate a justification, we view the evidence in the light most favorable to the defendant.  *State v. Nadeau*, 2007 ME 57, ¶ 10, 920 A.2d 452.

Viewed in this way, the justification is generated if the evidence is "sufficient to make the existence of all facts constituting the competing harms justification a reasonable hypothesis for the fact finder to entertain." *State v. Lemieux*, 2001 ME 46, ¶ 3, 767 A.2d 295 (quotation marks omitted).

[¶32] There are four elements of the competing harms justification: "(1) the defendant or another person must be threatened with imminent physical harm, when viewed objectively; (2) the present conduct must be for the purpose of preventing a greater harm, or stated another way, the urgency of the present harm must outweigh the harm that the violated statute seeks to prevent; (3) the defendant must subjectively believe that his conduct is necessary; and (4) the defendant must have no reasonable, legal alternatives to the conduct." *Nadeau*, 2007 ME 57, ¶ 13, 920 A.2d 452 (citations omitted) (quotation marks omitted); *see* 17-A M.R.S. § 103(1) (2017). If generated, the State has the burden of persuasion to disprove the justification beyond a reasonable doubt. *See State v. Ouellette*, 2012 ME 11, ¶ 8, 37 A.3d 921.

1.    OUI

[¶33] We are not persuaded by Nobles's argument that the jury should have been instructed on the justification of competing harms with respect to the OUI charge. To establish the elements of OUI, the State was required to

prove that Nobles "[o]perate[d] a motor vehicle [w]hile under the influence of intoxicants." 29-A M.R.S. § 2411(1-A)(A)(1) (2017). Unlike the crime of operating after revocation, the crime of OUI does not require operation on a *public* way. *Compare id. with* 29-A M.R.S. § 2557-A(1)(A) (2017). Because Nobles, who denied having consumed alcohol at all on July 6, 2016, admitted that he was operating the vehicle before he encountered the witness and her husband, even viewing the facts most favorably to him, he has admitted that he operated his vehicle at a time when no cause to evade them had yet arisen. Accordingly, the trial court did not err when it determined that a competing harms instruction was not generated for the OUI charge.

2.    Driving to Endanger

[¶34] Because Nobles did not request the competing harms instruction for the charge of driving to endanger, his argument that the instruction should have been given for that charge is unpreserved. If a defendant explicitly waives the delivery of an instruction or makes a strategic or tactical decision not to request it, we will decline to engage in appellate review, even for obvious error. *See State v. Ford*, 2013 ME 96, ¶¶ 15-17, 82 A.3d 75; *see also* 17-A M.R.S. § 101(1), (3) (2017) (stating that, with respect to statutory defenses—

including justifications—a trial court is not required "to instruct on an issue that has been waived by the defendant").

[¶35] Here, although Nobles did not expressly waive the instruction for the charge of driving to endanger, when he was specifically asked to identify the charges for which he sought the instruction, he did not include that charge. He first requested the instruction only with respect to the charge of operating after revocation. After some discussion about whether the evidence generated the instruction for that charge, Nobles added, "I'll tag it on to the OUI but, you know, my client . . . he's saying . . . he wasn't drinking." The court asked, "[Y]ou're now asking for it . . . on the OUI?" and Nobles responded, "Yes, I am." Never did Nobles identify the charge of driving to endanger as a charge for which the competing harms instruction was generated.[6] Given Nobles's explicit decision to request the competing harms instruction only for the two other charges, we do not entertain his challenge to the court's instructions on driving to endanger. *See Ford*, 2013 ME 96, ¶¶ 15-17, 82 A.3d 75.

The entry is:

Judgment affirmed.

---

[6] This choice is understandable; the instructions on driving to endanger required the jury to consider more broadly whether Nobles, in driving as he did on July 6, 2016, acted in "gross deviation from the standard of conduct that a reasonable and prudent person would observe *in the same situation*." 17-A M.R.S. § 35(4)(C) (2017) (emphasis added); *see also* 29-A M.R.S. § 2413(1) (2017).

Tina Heather Nadeau, Esq. (orally), The Law Office of Tina Heather Nadeau, PLLC, Portland, for appellant Eric Nobles

R. Christopher Almy, District Attorney, and Chris Ka Sin Chu, Asst. Dist. Atty. (orally), Prosecutorial District V, Bangor, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2016-2580
FOR CLERK REFERENCE ONLY